MOORE, Retired Circuit Judge.
The appellant was indicted, tried and convicted for the offense of murder in the first degree. Final judgment was entered; hence this appeal.
Willie Lewis testified that he lived at 1301 French Street, Montgomery, Montgomery County, Alabama, and was living at that address on July 15, 1975. He testified that he knew appellant, Jessie Mainor, and that he knew George Chesson, the deceased. On the night of July 12,1975, Jessie Mainor and George Chesson were at his home. He said that he heard some shots fired and went into the kitchen about five or ten minutes after hearing the shots and saw Chesson standing by the stove. Chesson had not been shot at that time. After Lewis heard the shots he saw Chesson lying outside by the front door, and appellant walking around in the room with a twenty-five automatic swinging on his finger and a thirty-two nickle plated revolver in one hand. Mainor had the two weapons. Appellant said at that time, “I told you all that I would take a gun from any son of a b-” He had the .25 automatic spinning around on his finger. Lewis said appellant left the house and he did not see him again that night.
On cross-examination, Lewis testified that he was in the kitchen when he heard the first shots. He said the shots were in the front room and he did not know where the shots came from but they were in the house. Lewis stated he heard two shots but he did not know who fired them. He said about eight or ten people were in the kitchen with him and there were about fifteen or twenty people in the living room.
Dorothy Harris testified in substance that she lived at 1520 Withers Street in north Montgomery and on the night of July 12, 1975, she was at the home of Willie Lewis at 1301 French Street. She said that she got there about 10:30 P.M. and a “lot of people” were at the house, including George Chesson, when she arrived. Harris also saw Jessie Mainor there. When she saw him coming in the door he did not say anything and then she heard a shot. Harris stated they all ran into the kitchen and she then heard two more shots. She said Mainor and Chesson were on the floor “tussling up against the wall by the window” and the gun was between them but it was in Jessie Mainor’s hand. Harris was looking back into the room. It was about a minute or a minute and a half after Mainor came into the front room before she heard the first shot. She did not hear any arguing or see any fight between Mainor and Chesson be *1085 fore she heard the first shot. Harris did not see Chesson before she heard the first shot and did not see Chesson with a gun that night. Later she saw George Chesson right by Lewis’ house in the bushes outside of his house. It was about five minutes after all the shots were fired that Harris saw Chesson in the bushes. She had walked out on the porch and heard someone say, “Help me” and had “walked around there and stepped on George’s hand.” Harris said Mainor came back there and that when he walked in the bushes he said: “I am going to show this m-f_who he is f_with.” Harris then called the police and was there when they came.
On cross-examination, Harris testified that she saw Mainor come in the front door but did not see who shot first. She ran in the kitchen when the first shot was fired, and saw the next two shots fired. According to Harris it was about five or six minutes between the firing of the first shot and the next two. She saw Mainor and Chesson “tussling” during that time. Harris stated: “. . . George was holding Jessie by the wrist: the hand that he had the pistol in, George was holding it.” She could not see what, if anything, George was doing with his other hand since she could not see it. Harris could only see one gun but could not see it at the time of the last two shots because, at that time, the gun was between Mainor and Chesson.
Mary Louise Butler testified in substance, that she was Jessie Mainor’s girl friend and that on July 12, 1975, about 11:00 P.M., she saw Mainor at her home on Foster Street. Mainor told her “. . he and some dude had got into it up at Lewis’ house” and that he had shot a man. He gave her the pistol that night and told her to keep it. Mainor told her: “. . . that was George’s gun that he had taken from him” and “. . . that he had shot George with George’s gun.” She and Mainor left her home and went eventually to his home, where they then went to bed. Butler heard knocking on the door about 2:00 A.M., but as she was getting up to answer the door, the police knocked in the door. When the first knocking was going on, Jessie told her to keep quiet, which she did. Butler went to police headquarters where she talked to the police. She then went home and got the pistol Jessie had given her and gave it to the police.
The appellant had a motion which had been filed to suppress the pistol as evidence as being the product of an illegal search. It was called to the court’s attention out of the presence of the jury and was denied by the trial judge. Also, at this point in the trial, and not in the presence of the jury, the attorney for appellant stated:
. .as far as the witness, Dorothy Harris, where the Court sustained the State’s objections to my going in to some past difficulties in questioning that witness, I would offer to show to the Court that my purpose in doing so was to show some difficulties that had occurred between the Defendant and that Young or a friend of hers within about two months of the date of this incident, that this witness had stated to the Defendant that she would get even with him and get him one way or the other. . . . We were trying to show bias and prejudice on the part of the witness. . . .”
The trial court’s reply to that was: “Okay. Bring the jury in.”
D. G. Johnson, a detective of the Montgomery Police Department, testified in substance, that he and C. H. Brannon, his partner, investigated the shooting in question. He saw the deceased at the 1301 French Street address and talked with three witnesses. An ambulance took the body away. Johnson and Brannon went to appellant’s apartment and knocked on the door and received no answer. After knocking again and receiving no answer, they went downstairs to the manager’s apartment. He was not there and they went back to appellant’s apartment and knocked again and announced themselves as police officers. They heard footsteps and somebody bumping into something, and “knocked the door down.” Jessie Lee Mainor and Mary Butler were in the apartment. Jessie was standing by a chest of drawers and they arrested him at that time.
*1086 Johnson further testified, in substance, that at the time appellant was arrested he read to appellant his rights from a card he had. He read the card into the record. (The card as read was the complete “Miranda warnings.”) Johnson said that after reading the card to the appellant, appellant stated he understood those rights.
The witness further testified, in substance, that at 5:00 A.M., July 13, 1975, the appellant gave the statement to him which he wrote down. Before appellant gave the statement Johnson read to him from a rights form, which was kept at police headquarters. The form was identified by the witness and admitted in evidence as State’s Exhibit No. 3. The appellant refused to sign the form, Exhibit No. 3, but it was identical to the one read to him at the time of his arrest, as far as his constitutional rights were concerned. It showed appellant refused to sign it, but Johnson stated that when the same rights were read to him at the time of his arrest, appellant understood them. The State further showed by the testimony that the statement made by appellant to the witness was voluntarily made. Johnson testified the statement was made by appellant and signed by appellant after it was read to him. Johnson said he also signed the statement. The statement, which was in the nature of a confession, was read to the jury and admitted in evidence as State’s Exhibit No. 4.
The statement, Exhibit No. 4, contained the following questions and answers:

“Q. Did you shoot up Lewis [sic] place last week?
“A. No.
“Q. Have you ever fired a gun in his place before tonight?
“A. No.”
The appellant objected to the admission of that part of the statement as being irrelevant and prejudicial. His objection was overruled.
In the statement the appellant stated that when he walked into the house a black male, whose name was unknown to him, started calling him a “b. Mainor stated he was standing by a woman whom the deceased called a "b_” He stated the deceased then “went into his pockets” and that he tried to shoot the deceased’s hand but hit him in the leg. Mainor stated that he pulled his gun and “. . , I grabbed his hand and tried to hold him off of me. . . , We tussled for a few minutes and my gun went off again.” He stated that he took deceased’s gun and left by the front door.
There were other statements by the appellant contained in Exhibit No. 4, but the above is sufficient as far as the issues, ■raised on this appeal, are concerned.
Willie Lewis was recalled as a witness for the State and we here quote the record with regard to his testimony given, at this time, in answer to questions propounded by the assistant district attorney:
# # # * * #
“Q Now, Mr. Lewis.
“A Yes, sir.
“Q Did you see Jessie Mainor, the Defendant, approximately a week prior to his shooting of Mr. George Chesson?
“A Yes.
“Q Did you see him at your house?
“A Yes.
“Q At that occasion—
“MR. COLLIER: Your Honor, at this time, if I anticipate what Mr. Price is going into, I would like to have this testimony, to have an in camera hearing on this testimony prior its being presented.
“THE COURT: Very well.
“BAILIFF K. W. JONES: The jury will go into the jury room, please.
“(The jury goes to the jury room.)
“OUTSIDE THE PRESENCE OF THE JURY
“THE COURT: Very well, what is it now, Mr. Collier?
“MR. COLLIER: Your Honor, I believe Mr. Price — if I am wrong, Mr. Price can correct me — I believe tliat Mr. Price is *1087 attempting, or was intending to solicit from this witness certain acts or actions of this Defendant not against the decedent approximately a week before the events here, which would tend, I guess, to go toward the reputation or character of the Defendant.
“MR. PRICE: No.
“MR. COLLIER: And his character or reputation is not yet in issue; and prior acts directed to someone other than the decedent — I am not even sure that prior acts directed to the decedent would be admissible — but something that happens over a week before the alleged events of this case, would hardly be relevant to this case.
“THE COURT: Well, let’s ascertain first: what do you want to show, Mr. D. A.”
“MR. PRICE: Okay, Your Honor, just one question: The statement is in evidence which Your Honor has already overruled Mr. Collier’s and Mr. Walden’s objection to it, that part of the statement where ‘Did you shoot up Lewis’ place last week?’ Now, that part is in evidence at this stage, Your Honor, and the Defendant’s answer was, no. I want to ask Mr. Lewis one question: did he, or did he not; and then, I will go ahead and tell Your Honor, another question I want to ask Mr. Lewis, but I don’t think that the witness understood it on direct examination this morning; and that is, was Jessie Mainor at his house earlier that night, and did he leave and come back; and that is all I recall this witness for.
“THE COURT: Very well, I am going to allow him to answer it: overruled.
“MR. PRICE: Thank you, Your Honor.
“MR. WALDEN: Judge, are you going to ask about someone a week before then?
“THE COURT: What is the form of the question?
“MR. PRICE: Your Honor, what’s in evidence here is that, ‘Did you shoot up Mr. Lewis’ house’ — the Defendant is not my witness — ‘a week before?’ Answer, ‘No.’ I want to ask Mr. Lewis this, and I think that the answer would simply be, yes, yes, and then, and then the other question—
“THE COURT: It was for the purpose of contradiction?
“MR. PRICE: Yes, sir.
“MR. WALDEN: You see, Judge, let me say this about this: that is a statement that’s in that thing, we have got an objection to. You overruled the objection.
“MR. PRICE: That’s right.
“MR. WALDEN: But that’s not relevant to the issue in this case, and it’s not used for any purpose, and it’s just prejudicial, and its evidence of a prior crime, if it is a crime, which is not related to this; and the Court knows that you can’t bring other crimes on this—
“THE COURT: No, this wouldn’t be tantamount to a crime.
“MR. WALDEN: Well, what is it if it says that he goes in there and shoots—
“THE COURT: It’s for contradiction.
“MR. PRICE: Contradiction of this witness’s testimony.
“MR. WALDEN: If he goes in there and shoots up the house, that’s a crime.
“THE COURT: Well, that wouldn’t necessarily be so, it could be an accident, shooting up—
“MR. WALDEN: Yes, but we have an exception, Your Honor.
“THE COURT: I think that he had a right, Mr. Walden, to offer that testimony in contradiction.
“MR. COLLIER: Your Honor, I would like to find out one other thing: Mr. Price is going to ask the second question, and I’d like to know if this witness has discussed this case with Mr. Price, or any other witnesses since his testimony this morning?
“MR. PRICE: Let the record show—
“THE WITNESS: No.
“MR. PRICE: He can answer that. Let the record show that in preparing this case, and to continue to prosecute this case, it’s my responsitility [sic] to prepare my witnesses and my talking to my witnesses, and I have—
*1088 “THE COURT: He is authorized to do that.
“MR. COLLIER: Your Honor, what I am asking is this: if Mr. Price intends to have this witness called back and to have him contradict the statement that he made on the stand this morning—
“MR. PRICE: Well, it’s not contradiction, Your Honor.
“THE COURT: No, it’s correction of this.
“MR. COLLIER: He said his second question, Judge, was to contradict some testimony that he gave on this morning.
“MR. PRICE: No, sir, no, sir, I didn’t say that.
“MR. COLLIER: You said that you were going to ask him if he—
“MR. PRICE: No, the second question, Your Honor, just goes on to further clarification of additional evidence. It’s not to contradict anything that Mr. Lewis said this morning.
“THE COURT: Very well, bring the jury in.
“(The jury returns back to the jury box.)
“IN THE PRESENCE OF THE JURY
“Q (By Mr. Price) Now, Mr. Lewis, I believe I asked you, sir, did you have occasion to see the Defendant, Jessie Mainor, at your house approximately one week prior to the night that George Chesson was shot?
“A Yes, sir.
“MR. COLLIER: Your Honor, can I assume that we have an objection based on the in camera hearing?
“THE COURT: (No ruling)
“Q (By Mr. Price) And I’ll ask you, sir, did the Defendant, Jessie Mainor, shoot up the house—
“MR. WALDEN: We are going to object to the form of that question.
“THE COURT: Well, wait until he finishes the question.
“Q (By Mr. Price) — at that time?
“A Yes.
“MR. WALDEN: Now you see there, before I had a chance to object.
“THE COURT: Well, I didn’t hear the question.
“Q (By Mr. Price) I’ll ask you, Mr. Lewis, did Jessie Mainor have an occasion to shoot up, to shoot in your house at that time, the week prior to the time that Jessie Chesson was shot? Now, hold your answer.
“THE COURT: And you object.
“MR. WALDEN: Yes, sir, we object to that. We object to the form of the question, and we object further, that it is incompetent, irrelevant and has no bearing—
“THE COURT: As I have stated, Mr. Walden, it’s admitted solely for the purpose of contradiction, if any: overruled.
“Q (By Mr. Price) Did the Defendant, Jessie Mainor, shoot up your house or shoot in your house on that occasion?
“A That’s right.
“MR. WALDEN: We object.”
We have quoted the record at great length because we consider the questions raised to be a matter of considerable importance.
Richard A. Roper, a State toxicologist, testified, in substance, that he performed a post-mortem examination of the body of George Chesson July 15, 1975. He found four wounds on the body. Two of the wounds were what is commonly called defense wounds. Roper removed two bullets from the body and stated that death resulted from hemorrhage and shock which resulted from gunshot wounds to the right thigh in which a major artery and vein were penetrated-. The two bullets recovered were .38 caliber. Roper found no powder burns on the wounds and said the weapon when fired was not adjacent to or against the body.
The State rested and the appellant made a written motion to exclude the evidence and for a directed verdict on the grounds set out in the motion. The motion was overruled and denied by the trial court.
The appellant offered no testimony and rested.
*1089 There is substantial evidence in this case tending to prove every element of the offense for which the appellant was convicted. When that is the situation a motion to exclude the evidence is properly overruled and a jury question presented. Massengale v. State, 36 Ala.App. 195, 54 So.2d 85.
We come now to a consideration of the appellant’s contention that the trial court committed reversible error in the admission of that part of the appellant’s confession in which he was asked about another offense totally disconnected with the offense charged and the trial court permitting the State, over appellant’s objection, to prove by one of the State’s witnesses the commission of said offense on the theory of contradiction.
The appellant did not testify in this case and did not present any witnesses. The only evidence that it could contradict was a part of the confession the State offered in evidence. The appellant objected to the admission of that part of the confession, or it would be more correct to say, to that part of the statement.
In presenting a written confession to a jury the law does not require the State to present all of it. The State may present or cause to be read to the jury that part of the confession that is admissible evidence.
In Mullis v. State, 258 Ala. 309, 62 So.2d 451, the court said:
“Likewise there was no error in reading portions of the signed written confession to the jury, the solicitor being of opinion that certain portions of the confession were inadmissible. The defendant had the right to introduce the entire confession . . . .”
The prosecution is not injured if the trial court rules inadmissible statements contained in a written confession which have no reference to the charge against the defendant and which if offered in any other manner would be clearly inadmissible. If the appellant in the case before us had taken the stand and testified, the questions and answers in that portion of the confession objected to, addressed to him during his testimony, would have been clearly subject to an objection. It would and does constitute an effort to prove an offense totally disconnected with the offense charged which was not necessary to prove in order to show a fact related to the appellant’s guilt of the offense charged. Of course, proof of other offenses are sometimes admissible as exceptions to the general rule of being inadmissible, but this is not one of the exceptions. It in no way shows intent, scheme or pattern of actions. It was not an effort to conceal relevant evidence or a part of the res gestae. Its proof does not reveal a fact relevant to the appellant’s guilt. Those statements should not have been admitted as part of the confession. Had those questions and answers been ruled out there would have been nothing to contradict. Evidence and testimony later offered by the State that the appellant “shot up” or “shot in” the house in question, about a week before the killing involved in the case before us, merely proved another disconnected crime and were inadmissible.
If officers, untrained in the law of evidence, in taking confessions of guilt of a particular offense are then permitted in the same written statement to explore the entire life of a defendant and question him or her as to many other offenses and the rules of evidence then hold that since the proof of other offenses are contained in the same written instrument with the confession of guilt of the offense charged that that proof is admissible; such a rule would have a tragic legal effect. It would constitute a way to prove something out of court and without the guidance of a judge and quite often without counsel that could not be proved in court during a trial. It might have the effect of forcing the defendant to take the stand and testify in the trial of the charge against him or it might prevent him from so doing. It certainly brings to court illegal and incompetent evidence. Such a rule would clear the pathway for over zealous officers to always ask such questions in taking confessions, which would amount to no more or less than a trick, scheme or device to engulf the ignorant and unwary *1090 in a sea of incompetent and prejudicial evidence. The law of evidence does not seek verdicts at the hands of courts or juries on prejudice or bias obtained by the use of such evidence. There has been a long legal struggle to free confessions from unjustly applied police force, to soften the impact of in-custody questioning and to impose the “Miranda warnings.” We must not turn the wheels of justice back now, even in confessions otherwise lawfully obtained by making such confessions the instrument for the admission of illegal, incompetent and prejudicial testimony or evidence.
In Hyde v. State, 13 Ala.App. 189, 68 So. 673, the defendant was charged with the sale of prohibited liquors. The State witnesses testified that on June 14, 1914, they bought from the defendant some beer and whiskey. The solicitor was then permitted over the objection and exception of the defendant to ask one of the said witnesses whether or not prior to this date, he had seen a large quantity of whiskey being carried to the defendant’s house and the witness answered, “Yes.” The court in this case said:
“If the defendant had been charged with keeping for sale prohibited liquors, which offense can usually be established only by circumstantial evidence, or if the evidence relied on for a conviction of a sale had been circumstantial, and not positive, then we conceive that the question to and answer of the witness would have been entirely competent. . . . But where, as here, he is only charged with a sale, and the evidence relied on for establishing his guilt is not circumstantial, but positive . . . the rule is different.

“Under the complaint, which charged only a sale, if the jury believed the testimony of these witnesses as to the main fact, the sale, then the collateral fact was entirely immaterial; . . .. The only effect, therefore, of allowing these witnesses to testify as to the collateral fact was to uselessly multiply the issues to the defendant’s detriment.” [Citations and bracketed material omitted.]
The defendant put on witnesses, in the above mentioned case, that were present at said sale according to the testimony of the State’s witnesses, who testified that no such sale took place. On cross-examination of one of those defense witnesses, the solicitor was allowed over objection and exception of the defendant to ask the witness if he, the witness, had not bought some whiskey from the defendant on the Sunday next before June 14, 1914. The witness answered, “No.” The State, over defendant’s objection and exception, was permitted to show by the same witnesses that had testified to the sale by defendant on June 14, 1914, that on the preceding Sunday, said witness had bought some whiskey from the defendant. In answering the question thus raised the court said:
“. . . The court erred in admitting this testimony, whether the purpose of it was to show a separate and distinct sale from that relied on for conviction (Moore v. State, 10 Ala.App. 179, 64 So. 520), or whether its purpose was to impeach the defendant’s witness, . . . who denied buying whisky from defendant. It is not permissible to impeach a witness as to an immaterial matter . . .[Citations omitted].
A witness’ testimony cannot be impeached upon an immaterial question. Jones v. State, 16 Ala.App. 154, 75 So. 830.
It would be a strange rule of evidence to hold that an immaterial statement in a confession could be impeached when the same immaterial statement made in open court and under oath could not be impeached.
That part of the confession objected to should have been excluded or not admitted in evidence over the objection of the appellant, and the testimony of the State’s witness that the appellant “shot up” or “shot in” the house was immaterial, incompetent and prejudicial, and multiplied the issues to the appellant’s detriment. Reversible error is thus made to appear.
That which has been said is not a reflection on the officers involved in this case. We are convinced they acted in an honest *1091 and diligent manner, but do see how such a situation could be used in the future as an instrument of great harm. The immaterial statements in the confession and the testimony of the State’s witness to the prior offense does necessitate a reversal regardless of the absence of motive in bringing them into being.
After a careful reading and study of the record in the case before us, we do not find merit in any of the other contentions of the appellant for reversal. We have searched the record for error and have found none except that which is set forth in this opinion.
It is therefore ordered and adjudged by this court that for the error noted the final judgment of the trial court is reversed and the cause is remanded to the trial court for further proceedings therein.
The foregoing opinion was prepared by the Honorable L. S. Moore, a retired Circuit Judge, serving as a Judge of this Court, under the provisions of § 6.10 of the new Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.